All right, I'm going to call 19-5059 United States v. Morales, and I hope that we have Mr. Duncan and Mr. Derryberry on the line, and assuming that we do, Mr. Duncan, you can proceed when you're ready. Thank you, Your Honor. May it please the Court, Thomas Duncan for the United States. The government wins this appeal for three reasons. First, the circumstances on the ground give Officer Phillips ample reason to check a widely used law enforcement database that focuses on border crossings and detailed criminal records at the time in the stop when he consulted that database. Second, the district court's rationales for rejecting the officer's investigative choice were themselves unreasonable. Third, the officer acted reasonably diligently in making the call. As to the first reason, at minute 17 of the stop, the officer not only had reasonable suspicion, but as the district court itself noted, quoting this court's Marquez-Diaz decision, cascading events had added to Officer Phillips' suspicion such that at the end of the conversation with Robles, the officer, for the first time in the stop, had heightened reasonable suspicion of drug trafficking. Under Grand v. Connor and under Sharp, the officer had more latitude in his investigative choices at that moment, not less. And the facts that the officer testified to showed that calling the El Paso Intelligence Center at that moment was reasonable under the Fourth Amendment, including the testimony that Route 69 traffic commonly originates from the border, including Morales' prior conviction from El Paso for conspiracy to import over 100 kilograms of marijuana into the United States, including Robles' contradictory statement of when he had last crossed the border, the officer was somewhat limited in the information he could glean from his in-car computer. Under Terry, the epic call was reasonably related in scope to the circumstances that justified the interference. As to the second reason, the district court's rationales, as this court knows, reasonableness under the Fourth Amendment is reviewed de novo. Reviewing the district court's reasonableness holding de novo, the district court's rationales were themselves unreasonable. One of the rationales was that it was unreasonable for the officer to check border crossing information because the suspects had already told the officer when they had last crossed the border. That rationale is unreasonable because in cases like Burleson and Soto Cervantes, this court said it's reasonable during an investigative detention for an officer to try to confirm what suspects had told him. And during this stop, Robles and Morales had contradicted themselves so often, not only was it reasonable to confirm their story, it would have been bad police work not to confirm it. Another rationale of the district court was that the officer's actions didn't match up with his intentions. That's unreasonable because the Fourth Amendment is about objective reasonableness, not subjective intentions. The Burleson case, among others, shows us that, saying it was error for the district court to consider the officer's subjective intentions. As to the third reason the government wins, the officer acted reasonably diligently in the district court's Mayville decision. He placed the call, he gave information when asked, he was placed on hold, and there's no indication that he acted unreasonably during that call to extend it or to make it longer than it needed to be. To the extent that the court falls... Mr. Duncan, let's pause there and get to some questioning. Let's assume that the officer had reasonable suspicion at the time that he called the EPIC database. Although the call could confirm the border-crossing statement that Robles had made, what possible addition to the reasonable suspicion calculus would that information provide? In other words, let's say EPIC comes back and it demonstrates that they had lied about their travel plans. That still doesn't get us to probable cause, and where are we left with... Unless you disagree with that at some point, regardless of that lie, they're going to be let go, aren't they? No, I do disagree with that. I think, first of all, as we laid out in our reply brief, there's a strong possibility that depending on what they found during the EPIC call, that this could have led to probable cause. It would be like an investigative step like the fact that they had... Well, so first of all, EPIC, as the officer testified, could tell not only what border the men had crossed and what time they had crossed, but it could tell what times they had crossed. It could tell where they had started their travel on that day. So the officer could have found out from EPIC, actually, this car crossed the border about four hours ago, and also it had crossed the border 10 times in the last 10 days, and a was driven by a few different people, always two men, and information like that that could have then added to the officer's suspicion. And in a lot of cases, this court has established what it means to quickly confirm or dispel an officer's suspicion, like in Cash, bringing the probation officer to the scene. That's not something that necessarily would have answered the question of what the suspect's color, but it was relevant to the officer's development of his reasonable suspicion, because the probation officer knows more than the officer on the scene about this defendant, and actually just having the probation officer on the scene didn't end up creating probable cause in and of itself, but noticing of a gun ended up creating probable cause. And similarly, on the third of survival... On the diligence point, he didn't call EPIC until minute 16 of the stop, and he could have done that a lot earlier, and it's a little unclear from watching the video why it took EPIC 16 minutes to answer his questions, but Judge Egan was concerned that the officer really was not diligent in these circumstances, because he waited well into the detention before taking this additional investigatory step. Right. Well, so there's a couple things I would say to that. The first is that that is really an efficiency argument, not a diligence argument. The idea that the officer could have started this EPIC call right at the beginning of the stop, and then by minute 17, he might have had this information. But first of all, we don't, as citizens, want the rule to be that in a run-of-the-mill traffic stop, an officer has to take an investigative tactic like calling EPIC right from the get-go. It is reasonable in a run-of-the-mill traffic stop for the officer to rely on the Oklahoma system that he's been given. And the court said that the officer's actions up till minute 17, including all the questioning of Morales and including all the questioning of Robles, were reasonable under the circumstances, and there's been no contention by Mr. Morales that that finding of fact or finding of law was incorrect. Thank you, Judge Gusteau. And it was only after minute 17. Judge Gusteau? Yes. Thank you. I suppose, just looking at the facts of this case, the thing that's most troubling to all of us is the length of the stop, 32 minutes. Yes, Your Honor. Does that... How do we say that that is a reasonable duration for a traffic stop? I think that 32 minutes likely would not be a reasonable duration just to conduct the routine activities of a traffic stop. But this was a traffic stop that was extended because of reasonable suspicion, unlike the traffic stops in Rodriguez and Clark, for example. So you have to look at this court's case law about stops extended by reasonable suspicion, like Soto Cervantes. That was an investigative detention that took over an hour. Like Rutherford, based on reasonable suspicion of marijuana trafficking. That was an investigative detention that took over an hour. When in the discussions with these travelers, did the officer learn that they had crossed the border and wanted them to follow up on that information? The officer, during the discussion, didn't learn that the men had crossed the border, but the officer serially and incrementally gained more and more suspicion that these men were involved in drug trafficking. I thought one of them had told the officer they had crossed the border. Is that not accurate? That's correct. He didn't say that he had crossed the border that day in that car, but he did say that he had crossed the border, and that was Mr. Robles. And how far into the stop did that information come to light? That was during that six-minute questioning of Robles that came just prior to the epic call. So that was when the court said, essentially, you had run-of-the-mill reasonable suspicion up until talking to Robles. Now you talk to Robles, all of a sudden you've got heightened reasonable suspicion of drug trafficking, and you've got, like in Marquez Diaz, you've got a situation where cascading events have added to the officer's suspicion, and now he makes an objectively reasonable step. I think I want to confirm what they said earlier about border crossing in light of everything I've heard. And based on this court's case law, taking investigative steps that sometimes go longer than the person taking the step expects is not unreasonable. And it's important to understand that in Granby-Connor, the Supreme Court said that the court has to consider the case in light of the facts and circumstances confronting the officer. So at minute one and at minute four and at minute nine, the officer didn't have heightened reasonable suspicion of drug trafficking. It was at minute 17 when the officer had heightened reasonable suspicion of drug trafficking. And if the cases say anything, yes, Your Honor. Thank you. Judge Matson? Counsel, the district court found that additional information the officer learned from Epic, and I'm going to quote here, would neither have dispelled or confirmed his heightened reasonable suspicion of drug trafficking. That's the end of the quote. Isn't this a finding of fact that is of deference on appeal? No, Your Honor, and I'll tell you why I think that. The court was referring to, and you'll see there, the court said would not have confirmed nor dispelled his reasonable suspicion of drug trafficking. And that's referring back to the transcript at appendix page 123, where the court was talking with the officer, and the court said, would that, the information that he could learn from El Paso, have added to your reasonable suspicion? And the officer gave an answer, I'm just more concerned that if they had probation violations or anything like that, they don't always show up on OLEPs. And then he proceeded to talk about all the advantages of checking information from Epic versus from the Oklahoma system. So the district court here was concerned with the fact that the officer was describing the facts like an officer and not like a lawyer. The officer was not concerned with, I'd like to increase my reasonable suspicion. The officer was concerned with the facts on the ground, which were, I've got a situation here where there's a high suspicion I've got of drug trafficking, and I want to make sure that I reserve some of my time for rebuttal, but I'll make sure to finish my answer here. The officer wasn't answering the questions to the court's liking in terms of what would have confirmed or denied your reasonable suspicion. But as the court's cases tell us, as this court's cases tell us, and as the Supreme Court cases tell us, it's not about this officer's subjective reasonable suspicion. It's about taking all the facts that the court found, and there were extensive findings of fact in this case, taking all those facts objectively. Would an objective officer think that calling Epic was a reasonable step to do? And this court's cases have said in multiple cases the benefits of calling Epic and all the information you can get from Epic. However, to the extent this court disagrees and finds that that's a finding of fact rather than part and parcel of the court's reasonableness determination, then of course that finding of fact is clearly erroneous because of all the facts that the officer set out on the record about why calling Epic could get him information and would be likely, in fact, in this case, to get him information that would bear on in a material way this evolving situation. All right. Let me just be clear on this, because to me this is an important point. You've indicated that calling Epic served a confirming purpose, and what you're saying is that if the court thought that it didn't, and that's a finding of fact, you're saying that's clearly erroneous. If this court finds that that finding is a finding of fact, then yes, that finding of fact is clearly erroneous. All right. I understand your point. Thank you. Yes, Your Honor. Okay. I'd like to reserve. Yes, Your Honor. You may reserve the rest of your time. Let's hear from the public defender, Mr. Deriberi. Yes. May it please the court, for the record, I'm Barry Deriberi for Mr. Morales. Obviously, the picture is clear here to everybody, but I just want to address the events in the two segments in which they should be characterized in light of Terry v. Ohio applied to a traffic stop, which Judge Egan said occurred up through minute 12 in the timeline that we have of the recording, and in her finding, she said that all the tasks reasonably related to the traffic stop should have been completed at that point in time, versus Terry v. Ohio applied other than traffic stops, which is when you have reasonable suspicion that has developed about criminal activity, which Judge Egan in her findings recognizes as lasting 22 minutes after minute 12. And so what is provided to us by cases like Mayville is the right or sort of carte blanche opportunity of officers to run checks, warrant checks, triple I being involved in Mayville, whatever is at their disposal for purposes of safety to determine if there is a criminal background or outstanding warrants for the officer's information so the officer can gauge if there's safety issues, and that's always present and it doesn't have to be articulated by the officer in a given case. And that was done in this case with the OLETs is the acronym used that the officer did a check with to determine information about licensing and so on, as well as any outstanding warrants. And then he determined there were no outstanding warrants. So then at the end of the traffic stop, we begin to employ some different principles and that's where I, you know, with the 28J that we have Mayville being cited, that's where I point out that Mayville is not informative to or is not guidance to how this case should be resolved because the court in Mayville is looking at the scope of detention during a traffic stop and certainly is saying that the court's not going to nitpick the officer's conduct in terms of saying that you have to use your computer versus dispatch versus triple I. Counsel? Yes, sir. Judge Sienkiewicz, why couldn't a objectively reasonable officer use the EPIC database as a part of a stop like this? So if we're on the other side of the line from the traffic stop, then what I'm pointing out is that the safety concerns that always are present for all traffic stops become different because in this situation, in this case, the safety concerns that the officer may have have been investigated and the officer is not articulating any further concerns about safety. And in this record, he doesn't say that he did an EPIC check for purposes of safety. Well, it's an objective standard. Wouldn't an EPIC check really bear on officer's safety to some extent? For example, as your colleague suggested, if EPIC showed there were multiple crossings crossing the border that day with, you know, lots of passengers, you know, some other evidence that suggests more strongly suggests drug trafficking, wouldn't that knowledge inform the officer of how he wanted to complete the stop here or maybe whether he wanted to call in a drug sniffing dog at that point? So, I mean, just to begin with the latter, the officer did testify that in his outlook on what his options were that one of those options was to call in a canine. The one was not available. And so he just crossed that off. So in terms of the, you know, I want to, you know, I think this does get us to the issue that counsel was addressing about suggestions. Actually, I'll let you finish your statement. But on the dog sniffing point, our cases allow 25, 30 minutes for a dog to come in when you have reasonable suspicion of trafficking. And, you know, the EPIC, 16 minutes is within that window. So why would you, you know, treat that type of investigatory tactic differently than bringing in a sniffing dog, you know, if it's within the same time window? Okay. So presupposing with that that the EPIC check is a justified endeavor as part of the investigative detention, then I think the question is one about the length of time. And the record does not indicate why 15 minutes was necessary or if it was a standard amount of time. If you look at the drug dog, drug sniffing dog cases, for instance, you're going to have facts in those cases, especially the ones that have an extended duration where there's an explanation by the officer about, well, the other officer that had the canine was way down the road. It took him 20 minutes to drive to me. And this court in the last, I think, decade had a case similar to that that said, well, he was waiting on the dog to arrive. And that was accounted for. It was justified. And we don't have something similar in terms of a factual development from the officer that explained why this was taking 15 minutes and, as Judge Egan had pointed out, why he didn't begin to run that check. Yeah, but we can watch the video, which I did, and it's pretty clear the officer wasn't doing anything to delay a response from the EPIC people. You can listen in for yourself. So why would we pin that on the officer? Yeah, what I'm saying is not to pin it on the officer, but to look to the evidence provided by the officer, as we commonly do with officers explaining standard operating procedure and what they typically do, et cetera, to give us some accounting for why this takes 15 minutes. Or else it just becomes a carte blanche. It just becomes a, you know, how would a court ever assess the reasonableness of duration? Okay, I just have one follow-up question, and then I'll pass to Judge Grisco. If the EPIC call had lasted only three minutes, would this have been a reasonable stop? No, I don't think it would have been reasonable. So it doesn't matter at all how long the EPIC call lasted at all then? It's a compounding factor in terms of compounding the degree. So as Judge Egan framed it in two different ways, she said that the EPIC check was unnecessary and unreasonable, and there's two components to that. Number one was doing the EPIC check at all, particularly with the officer. And what I wanted to say... Well, I realize Judge Grisco's got a question, you said, so let me yield to her. Judge Grisco. Thank you, thank you. To get into the timing of this, it was my understanding that the defendant here does not challenge the constitutionality of the actions of the officer through the first 16 minutes. Is that right? Not on appeal. There was a challenge in district court to... For our purposes, the first 16 minutes are good. And within those first 16 minutes, was there a basis for reasonable suspicion that drug trafficking was occurring? Yes, that is not questioned on appeal. Okay. So the officer then had reasonable suspicion to continue the stop and to verify information that he had learned thus far. Did he not? Looking at the purpose of what the officer did, which I do think is fair game for analyses of these cases, and that's to be distinguished from subjective intent, the officer did not state any purpose of verifying the report by Mr. Robles that he had crossed the border the previous Monday. So this is looking more at some fortuitous information that we're speculating Epic might or might not have provided. And I'd point out, too, this record does not develop the detail of what Epic would have potentially provided to this officer. This officer did not testify to what he hoped to get from Epic in terms of details, multiple crossings, dates and times at the crossings. But all of that is available through Epic. Isn't that a given? I don't know. I think I have to be agnostic about that because I don't have direct knowledge about that. But I don't think that's what we are... I don't think that's what this case... Wasn't there a reasonable basis for the officer to continue his investigation once one of these individuals volunteered to the officer that he had recently crossed the border? That information does justify continued investigation. Now, we're looking at this, though, through the lens of, as U.S. v. Sharpe tells us, whether the officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. So you're saying he had a reasonable suspicion to continue the stop. Yes. And so now we're questioning whether or not calling Epic was a reasonable investigative tool? Yes, we're looking at whether Epic is a means of investigation that would address his suspicions. And here in this case, we have the officer not at all saying that he called Epic to address suspicion that springs from Roblace's report of crossing the border. The officer did not express any concern about that. He said he wanted to see if there were probation violations, which Judge Egan said did not advance any investigative purpose because the officer knew about the criminal background that existed. And the... Thank you, thank you. I want to give Judge Matheson some time. Thank you. Okay. Judge Matheson? Uh, just building on the last call, it seems to me, breaking down the 32 minutes, the first 10 minutes were primarily, uh, focused on Mr. Morales. Then minutes 10 through 16 or 17, Officer Phillips, uh, uh, shifted his attention to Mr. Roblace, trying to learn more from Mr. Roblace, and did. Um, why would it be unreasonable at that point to try to learn more from Epic in minutes 17 to 32? Um, I believe that the... the, uh, officer is referring to the border-crossing information that, uh, when it's put in context of, as Judge Egan focused on, on context of that he had been told that Roblace had crossed the border. So Roblace was forthcoming, was candid about that. And in Judge Egan's findings, she, uh, as the finder of fact, appears to have credited that. This is not a situation where the officer ever said, well, I think... I questioned that. I think it was self-serving somehow, and I questioned that. Uh, so I needed to see for myself. I needed to confirm. The officer never testified to anything like that. Uh, but why wouldn't it be... Why, even if it was candid, uh, uh, what, what, what both of them were saying, Morales and Mr. Roblace for being candid, why wouldn't a reasonable officer, uh, wish to check just to make sure that he or she wasn't getting, uh, minimizing, um, candidness? In other words, it's one thing to be candid, and it's one thing to be fully candid. That's... Yeah, what that would be is... If I may conclude. Yeah, go ahead and conclude. Yes, uh, would establish a, uh, back to, as I said, carte blanche to all officers in these situations to all do ethic tests or checks and have it take as long as this or maybe perhaps longer in the next case. Uh, just in every, every case automatically they're given this, and so I'm saying that it needs to be justified in the particular facts and circumstances of the case. Here the officer did not say, well, ethic will tell me about various multiple crossings and times, and they're not... With a pattern, I would approach this differently. He never could explain what he would have done with information that he may have received from ethic. Uh, I'm excited that Judge Matheson, you might have been short-changed, but do you have any additional follow-up questions? No further questions. Thank you. All right. Um, thank you, Mr. Deriberi. I think, um, Mr. Duncan had reserved a few seconds, so we'll hear back from him on rebuttal. Yes, and before I begin, may I inquire? I've got myself at about a minute of rebuttal time, but would the official court timer be willing to let me know how much time... I'll give you 90 seconds. Thank you, Your Honor. Um, I just want to correct something that Mr. Deriberi said about ethic first and then make a follow-up point. First, Mr. Deriberi said that there were no facts in this record about what ethic could establish. Um, in the record at page 119, appendix 119, the officer said that, uh, he was looking for evidence of recent border crossings, and that's something that ethic could give him. He said that ethic, on page appendix at 123, he said that ethic could tell him where they started their travel, um, on that day, which he could not get from the Oklahoma system. Uh, at appendix at page 124, he said ethic could tell him the time that they had crossed. Um, he also said at other points, like at appendix page 113, that the inconsistent responses once he had talked to Mr. Robles told them that Morales and Robles had a made-up story. Um, and Mr. Derryberry also just said that the statement that Robles gave about border crossings did justify additional investigation. So what our cases show is, excuse me, what this court's cases show is that the investigative step need not itself immediately resolve, uh, reasonable suspicion or have the potential to immediately resolve reasonable suspicion, but the point is, in cases like Soto Cervantes and cases like Cash, if the officer finds out something else material that is deception from the defendants, that is something that will materially advance the investigation. And then, if the officer confronts the defendants about, well, you told me that, uh, you've, uh, only crossed the border on Monday or was it Wednesday? Um, but it says here you crossed the border, uh, 10 times in the last 10 days. That itself can then lead to more investigation and cascading events. Uh, then, uh, like in the Cash case, can lead to a situation where, uh, where it ripens into probable cause. Um, and the last point, if you'll allow me to make it, I know I've run out of time, but the district court did seem in this case to draw an arbitrary line between dog sniff cases and non-dog sniff cases. Our court, uh, this court's opinions show that an officer has more options available to him than simply asking for a dog sniff or asking for consent and that what the officer does should be specifically tailored to the case at hand. And the case at hand here at minute 17, when he had heightened reasonable suspicion of drug trafficking, called for some additional investigation of the statements that Robles had made to him. That's all I have. All right, counsel, thank you. I think we understand your respective arguments. We appreciate your time. Uh, counsel, our excuse in the case is submitted.